I have SD3 v. Black & Decker, and Mr. Schaefer. Good morning, Judge Wilkinson, and may it please the Court, Derek Schaefer here on behalf of the Plaintiffs' Appellants. Your Honors, the basis for reversing summary judgment and remanding for trial is straightforward and largely enumerated by the Court's prior opinion in this very case. Sawstop did not have the factual basis for its claim of a secret group boycott until Mr. Piott testified on February 25, 2010, which is undisputedly within four years of when the suit was brought. Both the decision below and the appellee's defense of it rests on the unsustainable premise that the facts Mr. Piott disclosed upon testifying in 2010 didn't supply factual basis for Sawstop's claim. We respectfully submit, Your Honors, and you will know best, that reviewing this Court's prior opinion and indeed opinions in this very case, the Court's opinion, the concurring opinion, and the dissent, they disprove that premise. They make clear in our... This time you have a different case. You have a different standard. You have a different proceeding. You have a different issue. It's not plausibility. It's proof of fraudulent concealment. And now you have evidence. We agree, Your Honor. And all I mean to say is that to the extent the claim that it's advanced and is the premise for the summary judgment decision is that Sawstop knew everything it needed to know in order to plead its operative claim even before Mr. Piott testified, we think the Court's prior opinion refutes that. And especially considering, as Judge Agee, you mentioned, the concerted efforts these defendants made to keep their group boycott secret and the necessity of the revelations that finally came in 2010 to Sawstop pleading its claim. This is a textbook case of fraudulent concealment that should go to a jury for it to decide based upon the evidence. And as Your Honor suggests, the evidence is there. And we further submit that unless this Court reverses, a Catch-22 will result. Fraudulent concealment by co-conspirators of their illegal restraints on trade will be encouraged and rewarded as co-conspirators will be assured that early claims will be dismissed as factually insufficient while factually sufficient claims will be dismissed as untimely when they're ultimately brought in light of the revelations that have been covered up. This Court warned against precisely such perversity in Supermarket of Marlington where it refused to let defendants, quote, use statutes of limitation to shield themselves from liability for unlawful conduct by keeping such conduct secret and ensured, quote, that wrongdoers are not permitted or encouraged to take advantage of the limitations, period, to commit secret illegal conduct without penalty, period, and close, quote. I'm quoting there from the Court's opinion at 7. The standard that you might have a claim, that you're on notice, that you might have a claim or that you're on notice that further diligence is required? As to inquiry notice, Your Honor, that may be true, and I want to address that specifically. But we think it most tossed up was on inquiry notice, and it discharged its obligation to pursue inquiries with reasonable diligence in multiple different respects. Didn't you go to the firm Quinn Emanuel well before 2010? Yes, Your Honor. I was referring to an email that's at 3653 of the appendix, and that was in 2006. And what Quinn Emanuel came back with in response to that inquiry was essentially a very polite, you don't have a valid claim. That's at least what I think a reasonable jury can conclude. They didn't have a claim they were willing to take on a contention fee, but they told them they had a claim. They even told them they had a statute of limitations problem. One of the things they said is that there might be that, Your Honor. They didn't have the evidence of fraudulent concealment at that point, and they certainly didn't have the revelations that came subsequently. One of the things that's said in that email is that the protective orders that were in place were preventing discovery in parallel litigation from turning up the evidence that's tossed up might need to rely on. The basic difficulty that I'm having with your equitable tolling claim under a fraudulent concealment doctrine is that in order for the statute of limitations to run, you have to know everything about your claim. In other words, in order for the statute of limitations to run, you're pretty nearly saying to me that you have to put yourself in a position that you would be following some sort of discovery. That just tears statutes of limitations up because the whole lawsuit has to count for something in terms of unearthing information. If you take the view that equitable tolling sets in, every time you're in possession of less than complete information, what does that do to the whole finality represented by a statute of limitations? Let me clarify respectfully, Your Honor. We're not saying we need to know everything. We simply need to know the facts that translate to a valid claim or a viable claim. We need to know the facts that are the basis for the claim. And in this case, the key facts, as was emphasized by the court previously, was the who, what, when, where, why, and how of this conspiracy being formed. Keep in mind that all of that was deeply concealed and misrepresented by the defendants in this case. That's what the evidence shows, that they were going in great lanes to keep these meetings secret. But the question is whether you were on notice. And as early as the 2002 convention, there were four of the manufacturers who, within a relatively short period of time, discontinued or broke off their negotiations with you. Or, in a pretextual manner, didn't send you a contract that was all but fully executed. And you say, okay, but until Mr. Piott testified, we didn't have the plus that goes along with parallel action. But, you know, again, the Supreme Court has made clear that that's just not the test. The test isn't whether you know every element of your claim, because very few putative plaintiffs do. The test is whether you were on inquiry notice or on notice that you would have a claim. Let me start with actual notice there, Your Honor, because as Your Honor emphasized, it was very loose parallel conduct. And as I think the court emphasized as well, there was a ruse to the way that those negotiations were broken off. So it would not reveal that there was, in fact, basis to plead a plausible claim, which is what we need to do in order to withstand a 12B6 motion to dismiss. To answer Judge Wilkerson's question, tell us the type of notice that you maintain is necessary. Is it an inquiry notice, or is it a constructive notice, or is it actual notice? And differentiate with me, if you can, the Pocahontas case, the gold computer case, as well as what standard do we apply? Thank you, Judge Wayne. So we think that inquiry notice begins when you basically have reason to be suspicious, absent some assurances that counteract that suspicion. Is that sufficient? Well, here, if there was that inquiry notice, and we would argue that there wasn't, because of all the assurances that came from the plaintiffs, including from the defendants, including to the government, that there was no collusion happening here. But assuming that it was inquiry notice, the obligation is one of reasonable diligence. And here's what Sawstopper's doing. You can find it at pages 62 and 63 of our opening. They were filing. In terms of inquiry notice, though, it seems like you're putting aside actual notice. You knew what the economic injury was. You knew that in 2001 or 2000. You knew what the cause of action was. Your principles were basically telling the world through newspapers, magazines, their deposition testimony, these folks are colluding against us. They use those terms. And they were certainly on notice of the publication in the Federal Register under the topic of antitrust. And they were looking, Judge Agee. They were basically filing FOIA requests. They were trying to gain admission to the Trade Association, being told that it was closed. They were voicing their suspicions aloud and getting specific representations that came back from the defendants to the government. I have a question. I want to hear the answer to that question. Mr. Gass, I guess, is the founder of Sawstopper. What about the public statements and the press releases that he was issuing at every turn in the road, indicating that these folks were colluding against him? I mean, you even had the motive as to why they were colluding against him, because they wanted to avoid products liability damages by having nobody adopt Sawstopper. Because if one person adopted Sawstopper and the others didn't adopt Sawstopper, that one person would be used as the fact that there was a safer alternative design, which is a classic products liability claim. There's a safer alternative design. And if one of the manufacturers didn't do that, didn't adopt Sawstopper, then the products liability case is substantially weakened. And that's why you knew it. You were claiming it. That's why the collusion. And what we respectfully submit, and I think that the prior opinion of this Court is good proof of it, Your Honor, is that loose parallel conduct plus motive plus suspicion would not have given rise to a valid claim of an illegal secret boycott. You're back in the box, because you're saying that you have to know every element of the claim. And the Supreme Court has never gone that far. Your Honor, we have to know the factual basis. That's our submission. We have to have a good faith basis to plead a factual basis. And that's what courts in Rebeef, the Ninth Circuit, Morton's Market, the Eleventh Circuit, the coordinated pretrial proceedings case involving petroleum products, they all say the fact that there are allegations out there and there are suspicions don't mean that you have a factual basis to plead a claim. No court, as far as we're aware, has held the opposite. But as to the reasonable inquiry, keep in mind that Sawstop had suspicions, goes to lawyers, says, do we have a claim? And the answer back from lawyers, we think a reasonable jury would conclude, was you don't. You don't have the direct evidence of conspiracy. There's too much that the other side can cite in terms of legitimate business reasons. Maybe they're protectable, but we can't, in good faith, allege it at the outset. And as far as the royalty demands. And it also says- Isn't the fundamental basis of your argument is what is necessary in order to constitute either inquiry notice or constructive notice? And it seems as though, from your position, suspicion or hunch alone is not enough. But if you read the Gold Computer case, you probably could come to that conclusion. Although I'm not sure it squares with Pope Hunter's, but nonetheless, it's there. Is that not the fundamental difference that we are talking about here and why you are arguing this? But if you don't get over that legal hurdle, you can argue these facts all you want. If that's the legal basis, you're going to be stuck, don't you think? Let me address that legal hurdle, Judge Wendt. So the D.C. Circuit in the Hobson case said mere hunch is not enough. The fact that you have suspicion, that's not what puts you on notice at that point in time. And as to Pocahontas, there, of course, the facts were public record. That's what the court relied on. You've got to deal with Gold Computer. I want to address that, Your Honor. It's right there in front of you. I want to speak to that if I may. In Gold Computer, you had an open and notorious abuse of monopoly power. The government had reported it to the would-be plaintiff there. The would-be plaintiff had gone to the government submitting declarations attesting to the fact that Microsoft had specifically been putting pressure on other companies not to do business with Gold Computer. And they reported that to Gold Computer. And Gold Computer went to the government with declarations that so attest to that. Why didn't your client ever go to the FTC or the Department of Justice? There's no case, Judge Agee, that says a would-be plaintiff has to do that specifically. They filed FOIA requests with the governmental agency that was essentially meeting with the table saw manufacturers, and they were blanked on that. And they'd been told by private counsel, essentially, that there was no valid claim here. They tried to do self-help to get admitted to the Trade Association. They could not do that. There were protective orders in place that specifically barred Softstop and Mr. Gas from getting admission to those protective orders. Those protective orders said what they said, and you can find it in 1138 and 1141 of the Joint Appendix, because there was an inquiry under way. Understanding the due diligence actions of Mr. Fanning and Dr. Gas, because Dr. Gas is an expert witness in these cases where collusion is lit, and he says, well, even though I'm an expert witness, it wasn't important enough to me to read the complaint. Mr. Fanning said, these guys are both lawyers, patent lawyers. He says, well, I'm following all these cases. This is part of my job. But I'm not reading the complaint to see any type of discussion of the complaint about collusion. Tell me how that's due diligence. Your Honor, they were trying to scan the public dockets as best they could. But even had they found in the public dockets a passing allegation to collusion, it was not supplying facts that were behind that as to what specifically happened on what day. They weren't supplying what Mr. Piott attested to in 2010. You don't read the complaints. How do you know whether the facts are in there or not? Well, but, Your Honor, there was a lot of ground potentially to cover. And when Mr. Gas and Sawstop were looking at whether they could get the facts that they needed, the factual goods that they were missing and were being concealed from them, they had protective orders that explicitly barred Mr. Gas and Sawstop from gaining admission. The reason for that we submit, the reason the jury concluded, is because they were making inquiries and the defendants here were concerned that their misconduct would come to light. I mean, equitable tolling is supposed to be sort of an exception to a statutory limitations period. It's not the rule. And as a practical matter, the injury occurred really in 2002 when the contractual negotiations were broken off in a relatively short frame of time and for contextual reasons, you claim, within that short frame of time in 2002. And even after that, the motive becomes clear. I think you find notes saying cover the paper trail, et cetera. But what we're doing now, what you're asking us to do, is take an injury that occurred in 2002, basically, and allow that to apply equitable tolling to allow a complaint in 2014. And that's 12 years later. We've expanded the statute of limitations by three times. And if part of the purpose of the statute of limitations is to protect finality and particularly to protect against stale evidence, what does it do when we take a four-year statute of limitations and use equitable tolling to expand it to 12? What does that do to the freshness of evidence and the whole ability of a judicial system to really get at what's accurate and true? Your Honor, Congress has provided for equitable tolling under this statute. If it wants a statute to repose, it can do that. Until then, the reasonable juries get to answer questions as to which there's room for dispute, and we submit there is here. If defendants in the position of these table saw manufacturers want to start the clock ticking, all they have to do is come clean. The record has abundant evidence, Judge Wilkinson, that these defendants very consciously wanted to keep hidden and wanted to misrepresent. I'm curious whether the weak part of your claim is not what the defendants did but whether you knew and whether you were on notice. And how could you not be on notice that what you claim was happening in 2002 at that time? Even if there was notice, the obligation was one of reasonable diligence. They discharged it in all the ways that I indicated in the record supports. And a reasonable jury, this is a classic jury question, could say that was enough reasonable diligence, and doing more would not have uncovered, especially given the on-point protective orders. No, because reasonable diligence, all of this period of time was lapsing while Conley v. Gibson is the law of the land. It's before Twombly, and it's before Iqbal. It's all under Conley. And Conley says, you can get by with anything in a complaint. And you surely had enough to use that Conley v. Gibson standard to file a complaint. You had it because it was the old relaxed standard that was in place most of this period. We have it from the U.S. Supreme Court, Your Honor, that Twombly did not change the law. Indeed, the Supreme Court could not change Rule 8 and the requirements of it. All it was doing was correcting errors that some had made in misreading Conley. And I don't think Sawstop can fairly be faulted. Related to the short and plain statement of the facts, and you could have listed all those manufacturers, and the fact that they, in order to avoid product liability damages, they suspended and colluded to abrogate their contracts with you, which were in a near-completed state. That's your complaint. We needed to have a plausible claim at all times, and I don't think it's fair to say that they should have pleaded an implied one. It's only with the benefit of hindsight and McPiat's testimony that all these dots connect the way they do, or at least a reasonable jury could so conclude. That's our respectful submission. I'll reserve, if I may, the balance of my time for rebuttal. We'll rest on our break as to the substitution issues. Thank you, Your Honor. Thank you. Mr. Harkwriter. Good morning. May it please the Court, my name is John Harkwriter. I represent Black & Decker, and I'll be arguing on behalf of the defendants. Sawstop claims that it was not on actual notice until 2010 when Dr. Gass heard David Piat testify in this area, that there was coordinated interaction. After hearing Piat's trial testimony, Dr. Gatt, he was, quote-unquote, stunned that there was a conspiracy. But Sawstop told its investors just two months after Piat's testimony, quote-unquote, we knew of the collusion, but it was surprising to hear Piat talk about it in open court. What type of notice is sufficient in order to trigger the statute of limitations four years ago? We believe it's inquiry notice under Go Computer. So when you speak to actual notice, tell me what you're talking about, as opposed to inquiry. Is that what you're saying? Sure. You know, it's a really good question. We've looked very carefully at this. We think that inquiry notice is when you know that there's a pattern of behavior against you, but you're not entirely sure what the exact scope of the claim is. We think that actual notice is when you have facts to lead you to believe what you think the cause of action is, in this case avoid who the defendants are, in this case the table saw manufacturer, and what their intent is, in other words, to avoid product. But you're saying actual notice is present here. We believe that actual notice is absolutely present, yes. Is this notice of every element, or is it necessary to have every element to have actual notice? Again, great question. We think the Supreme Court under Rotella says that in order for the statute to begin, you do not need to have evidence of all the elements of the claim. So what, tell me what, I understand to say that, but what does it mean? I mean, if you had ten elements and you only had this inquiry notice on one of them, you're saying that the other nine, you don't have to have that? Well, I think respectfully, if we go again to, if we go to what they could have alleged at that time, what did they know by 2002? So by 2002, they knew of parallel conduct, which was not taking a license. They also knew that there was an opportunity to collude, because in November 10th, I believe, of 2000, Dr. Gass watched members of the PTI listen to his presentation on SOSOP, and then in his own words, go into the other room and collude. Let me ask you this. Yes. I'm sorry, you're going with it. Yes. Is there a difference between actual knowledge of facts that would be sufficient and actual notice? I think that the Fourth Circuit has actually been clear that you don't need to have sort of the don of complete awareness, and it's sometimes difficult to parse exactly what that means, but I don't think what it means is that you need to have facts to prove every element of the claim, because if that were true, then instead of being encouraged to be diligent, and the Supreme Court and Rattel and Clair are very clear that in RICO and in the antitrust laws, we actually want to encourage plaintiffs to be diligent. If a law said that you don't have to actually be diligent and your claim doesn't start or it's infinitely told until you have all the evidence that you need, the smoking gun, direct evidence, all those things that you need, then instead of encouraging plaintiffs to go out there and actually investigate and be as diligent as possible, they would be sitting back on their rights, and you would have these bad consequences that come from that in terms of stale claims and in terms of lack of repose. Let me ask you just one thing. That's correct. That's correct. We think that they have actual notice. We think they have inquiry notice, and we also think that they were not diligent. Let me ask you just one little question before we get into other areas. Why does it seem to me that the decisive switch, the way they argued this case from the 12-6, it sounds like I heard the opposite on both sides. We're dealing with 12-6 as opposed to summary judgment. I think that's a great question. When we were evaluating the motion to dismiss, we were evaluating the sufficiency of the complaint that was before the court. Not a possible complaint, but the complaint before the court. And because they knew they had a statute of limitations problem in 2006, that's what Quinn Emanuel told them, and then they waited eight more years before bringing their claim, they crafted their complaint very carefully to make sure that PIAT was central to it. And so the question is whether that complaint was actually sufficient. And there were lots of allegations in that complaint that were plainly inconsistent with coordinated interaction. There were lots of pieces of evidence that they actually stated in their complaint that we thought made the complaint implausible. They could have, which is what I'm arguing right now, is based upon what they knew in 2002, namely parallel conduct, the motive, sudden change in behavior, concentrated industry, opportunity to collude. They could have pled the claim back then. It may not have been the exact same complaint. It wouldn't have said PIAT because at least in 2002 they didn't know about PIAT. Although, interestingly enough, in 2008 PIAT gave deposition testimony that was virtually identical to his trial testimony, and they didn't look at that because they didn't want to sign the protective order, which goes to the issue of diligence, and I know that's not your question. But I think that helps the difference between the complaint that was before the court when you made your decision and a complaint that they could have brought in 2002. They wouldn't have been the exact same complaint. So I think that maybe helps explain the difference between the two positions. So what effect does the training trust notice in the Federal Register have on your case? I think it has a really important one because the purpose of the notice in the Federal Register under the FCRPA, one of the consequences of publication is that you can no longer bring treble damages against the joint venture in that case. In other words, plaintiffs throughout the world essentially lose rights if there is notice and then nobody actually says anything. So the very purpose under the FCRPA of that notice is to solicit plaintiffs or potential plaintiffs to say, well, this is what we know, and we think that there was an obligation for them to go to the Department of Justice and actually say what they knew because the DOJ or the FTC didn't know what they knew. So they should have said, you know, FTC, DOJ, these people told us that they were going to squish us. These people, we knew that they were talking amongst each other. These people all refused to take a license, and so this joint venture, as Mr. Fanning actually believed, was a sham or there was something very suspicious about it. So we think that they had that the fact that the whole purpose of the Federal Register notification is to actually encourage plaintiffs to come to the agencies and bring evidence, and the fact that they didn't even do that actually goes very strongly to the issue of diligence. Because, in fact, you know, many antitrust claims that are out there that are brought by private plaintiffs follow on after, you know, after DOJ or FTC action. That's actually go computers. And so the purpose of the Federal Register is to get people to go to the agency, for the agency to then bring an investigation, and if, in fact, after issuing subpoenas and CIDs, they say, oh, this is Guy Piat, and this is what he said or this is what he believes, and then if they file a complaint, then they can follow immediately after that. So, you know, we think that that's important. This interests me, the different forms of notice. Yes. You talk about actual notice and inquiry notice. There can be some occasions where the actual notice is sufficiently strong that it would enable a plaintiff to file a complaint right then and there. It doesn't have to be a period of inquiry. Would you agree? Absolutely, Your Honor. There can be, and I gather your point is that all the things you listed about the parallel conduct, the convention, the motive, all of the opportunity to collude, the Conley v. Gibson standard, they could have filed in 2002.  In other words, you know, there's no inquiry period of grace if the actual notice is firm. That's absolutely correct. I mean, as we were thinking about this over the last week, the thing that we realized was that, you know, they actually, upon the moment of injury, which was people refusing to take a license, they actually had all of the elements of their claim. They could have brought their claim immediately in 2002, and they didn't. They had motive, opportunity. Well, see, that's what I'm getting at, that if you just say that every notice is automatically inquiry notice, then you build in a grace period of inquiry into the limitations period stretching for who knows how long. And the interesting thing is how inquiry notice ties in with the discovery process, because when you think of inquiry, part of the inquiry has to be the lawsuit itself, which is the most effective way of getting at things, because then you can pose questions directly of the defendant, which you can't do. They're not going to answer special interrogatories before a complaint has been filed. No way. So what I'm saying is this word inquiry, if we load it all onto the pre-complaint period and sort of forget that the crucial inquiry is what a lawsuit is designed to facilitate, then we've really done some damage to these limitations purposes. I agree completely, Your Honor, and I think that's especially true in an antitrust case where we're really trying to protect consumer welfare by encouraging plaintiffs to bring their claims as quickly as possible. To that point, when we are talking about diligence and talking about reasonable standards, those seem to be inquiries you would submit to a jury. There are courts that have 11th Circuit, for instance, market case submitted this whole question to the jury. Why should we not take the direction of other circuits? Because respectfully, I would suggest that where the undisputed facts are such that you can decide the issue on a matter of law. So this is not a question where there's some unrelated case on fixing of milk or dairy prices or catfish or petroleum or something of that nature or titanium, and you say, okay, well, there's a lawsuit over here. Does that mean that I know about it? Here they're actually involved in the litigation. So, for example, Dr. Gass, it's not just that he's not reading the complaints. He's actually alleging under oath in expert reports that there's actually collusion going on. So that's an undisputed fact. It's also an undisputed fact that the PIAT testimony, deposition testimony, occurred in 2008, and it's undisputed that had he signed the protective order, he could have gotten it. Now, it's true that had he signed the protective order, he might have had concerns about, you know, what other things that he could have seen, but as a lawyer, every case I've ever worked on, there has existed a protective order where my client hasn't been able to see things, but I have. So he could have had his lawyers look at that. So I agree with you that there are many cases where this might be a factual issue. It just so happens that this is not one of them because on the undisputed facts, which include the fact that he got the Federal Register notice and he didn't go to the FTC until 2013, I believe, the undisputed fact is that he could have seen the PIAT deposition testimony in 2008 but refused to sign the protective order. And the undisputed facts are also that this is not a case where, you know, the defendants say, you know, oh, there's no collusion, you know, prices went up because of rising input costs, which is titanium dioxide, and customers say, well, gee, I don't want to pay too much, but I have to believe you. I mean, why would I disbelieve you? Here it's undisputed that they actually didn't believe the defendants. The defendants said, you know, oh, you know, we're doing all of this independently, and it's not as if they're saying, oh, and we believe them. They're saying we didn't believe them. They're saying we always knew that there was collusion. They're saying to newspapers that there's collusion. They're saying under oath that there's collusion. How is it possible that you could fraudulently deceive if you, in fact, know and believe that not telling you the truth? So you can only rely upon denials, I think the law is actually black letter, if there is some either fiduciary duty or some reason to believe the denials. Here they didn't believe the denials. That's undisputed. So we would respectfully submit that on the undisputed facts that there is no question that they did not engage in diligence, and they clearly did not believe what they claim was fraudulently concealed for them. They could have brought their claim in 2002 under Twombly and certainly under Conley. I don't think that there's a reasonable question about that. They also knew, Defendant Bosch told plaintiffs that they had talked with Defendant Stelton Emerson about getting together and collectively licensing SOSOP in an industry deal. They knew, you know, obviously they had the Lanier speech, which they believed. They did not dispute when we said that that was a collective motive, not an individual motive,  They thought that the licensing rates and everything else was pretextual. They thought it was disingenuous. All of those things that they knew. So, you know, we don't think that we can imagine that there's a close case out there that should go to a jury. We just do not believe that this is the case. On the issue of whether Conley and Twombly have different standards, I'd just like to point out that this Court in McCleary ruled, quote, unquote, the Twombly Court explicitly overruled the earlier standard articulated in Conley. So the Catch-22 that they're talking about isn't a normative question of what the standard should have been under Rule 8. It's actually an empirical question. Would the claim have been dismissed? The claim would not have been dismissed under 2002. And frankly, had they pled their complaint correctly, we wouldn't have been arguing that their complaint should have been dismissed in 2010. They didn't need to add all those additional details that made conspiracy impossible. Actual laws like Twombly and McFaul puts us in a tailspin in terms of what to try to figure out. But in Twombly, Supreme Court sort of interestingly said, we're not creating a new pleading standard. Right. I think what the Supreme Court is saying, and I'll be as respectful as I can because it's not my place to say what the Supreme Court meant, was that that should have been the rule all along. And obviously they're not amending Rule 8, but what they are doing is they're interpreting it. And they're saying basically this is what the rule should have been the whole time. But it's pretty clear if you read McCleary, I think respectfully, that not all courts interpreted it that way. In fact, the Fourth Circuit appeared not to. And at least in the Fourth Circuit, that the standard got ratcheted up as a result of Conley. We think they could have met Twombly as well, at least had they pled their complaint properly. I'd like to just quickly deal with the issue in Go Computers. The issue in Go Computers isn't just was Microsoft a monopolist. Sure, it was a monopolist. Everybody knew that. The question was, were there things that Microsoft was doing that were preventing Go Computers from coming to market? And apparently all of those, a lot of those facts were actually concealed from the plaintiff by confidentiality agreements, protective orders, and the like. Nonetheless, this court held that they should have brought their claim. So, you know, there may be situations you don't have, like, every single fact that you need. As Your Honor had mentioned before, that's kind of what discovery is for. But they certainly could have pled parallel conduct plus as many as seven of the plus factors that you had said before. PIAT is the only thing that they claim that they didn't know, and PIAT's deposition testimony in 2008 gave them that. And, you know, all they can say that PIAT gave them is, you know, that there was a specific date. There were seven factors. Seven factors. There were only five. What two am I missing? Well, I'm not sure which ones you're thinking of. I'll give you the ones that I know of. So they could have alleged opportunity. They could have alleged ongoing communications. They could have alleged motive. I think I'm up to four now. Three. Okay. Maybe that's my problem. They could have alleged a sudden shift in behavior. They could have alleged disingenuous license offers. They could have alleged sudden shift in behavior. You said one twice. One twice. Okay. Well, my wife claims that I can't count either. These are the plus factors. Yeah, these are plus factors. But the underlying thing is, you know, there's parallel conduct, and then again there's parallel conduct. Sure. And, you know, I'm bound by the previous majority opinion in this case. That's what I'm following. Right. And they were saying this is not just an ordinary example of parallel conduct between two people. Right. This was an example of all the major players. Right. This is the majority opinion. Having the opportunity to exclude Sawstop, all of whom were in negotiations, some in a fairly completed stage of negotiation. The explanations were all sorts of fishy. They came through at what peculiarly was the same relatively short span of time. So this is not just your garden variety parallel conduct under the majority opinion. It's a very legitimate point that was made. I mean, this is high-octane parallel conduct, if there's such a thing. And they could have alleged that in 2002. So, okay. Thank you. Thank you. Thank you, Your Honors. Judge Wilkinson, I'd submit that the high-octane that was in the prior majority opinion were the revelations from Piotr's testimony. That's what made everything plausible. And if it wasn't for the who, what, when, where, and how, we would have been dead under 12b-6 for failure to state a claim. And so under their rule, there will be incentive, there will be encouragement, we respectfully submit, for folks to fraudulently conceal as best they can. I can promise you you would not have been dead under Conley v. Gibson. Please, take my word for it. Okay. Well, in the time machine, we will, Your Honor. But all this, we think, is infected to some extent by hindsight bias. And as Judge Wynn points out, it's a jury's call as to whether reasonable diligence, whether something more was required of the reasonable plaintiff, and whether that would have yielded the revelations. And I'd also point, Your Honors, to the Seventh Circuit's decision in INRI copper antitrust litigation, the INRI coordinated pretrial proceedings case we cite, and the INRI urethane antitrust litigation. They say all these are classic jury questions. And to your point, Judge Wilkinson, if there's actual notice, it's not a fraudulent concealment case. We have to show that Sawstop was not on actual notice. And we submit that we have shown that because the critical facts, the ones that were the basis for the claim, were not facts it learned of until Mr. Piott testified. And once there's inquiry notice, then reasonable diligence kicks in. And to quote Go Computer, I'd quote a diligent plaintiff, need not engage in ceases. I don't understand why there isn't just actual notice here on the basis of what happened in 2002. Well, and we'd respectfully submit that what we needed to be able to do was connect the dots to say, it's not just loose parallel conduct and a plus factor. The whole constellation that a court looks at to say, is this claim plausible? And many judges, Judge Wilkinson, are skeptical of these sorts of claims. And Twombly says courts have to have searching inquiry, and that's what the Supreme Court said has always been the correct understanding of Rule 8. And so we needed to have the goods to understand the fact, not the evidence, but the facts that indeed there was a meeting, there was a meeting of the minds, and all these concerted efforts were made. And if reasonable inquiry did not expose grounds for suit, in the words of Go Computer, then the clock is tolled. And I want to point to the protective orders. You can find on page 16 a screenshot of what they said. These were not standard protective orders. These were protective orders that said Mr. Gass and Sawstop could not, specifically could not be admitted to see these materials. And there was a reason that the defendants were covering this stuff up. They knew that the inquiries were ongoing. They knew that if we could get the facts, we could get to our claim, as we ultimately did years after the fact. The PIAT deposition testimony that's cited did not, contrary to my friend's submission, it did not specify that there was the October 2001 meeting where the plaintiffs decided they would have dropped a joint licensing strategy to beat Sawstop. They would be colluding and pooling data. All of that, all of that's what they were covering up, and Mr. PIAT didn't testify to that in 2010, even as to his deposition testimony. We were barred under the terms of the protective order from getting to that information for any purpose other than for that case and other product liability cases. So their submission that reasonable – Suppose Mr. PIAT didn't come along until 2017. Would you make no difference? We'd have to show reasonable diligence to the satisfaction of a reasonable jury, and that, in fact, doing more wouldn't have revealed – How long does all this stretch out? I mean, it's not as if you're a day late or a month late or a fortnight late or whatever. Twelve years. Well, no, eight years, Your Honor, beyond the statute of limitations is how long it goes for, and there have been longer – Twelve years from the injury and eight years – There have been longer cases in which – longer periods of fraudulent concealment that courts of appeals have signed off on. It's an equitable doctrine, and we still have to make the same showing. We have to show that, in fact, there was reasonable diligence exercised and that doing more would not have unearthed the facts. And here, nobody is able to tell you, Your Honors, what more we could have done that would have exposed the key facts, the ones that Mr. PIAT attested to in 2010. That's not on us, Your Honors. That's on the parties that fraudulently concealed and went to these extraordinary lengths to misrepresent what they were doing to government regulators and to SawStop, to establish these protective orders and to be enforcing them, to basically close these meetings so that we couldn't gain admission and we couldn't find out, even though we tried, as the record abundantly confirms. And as to the Federal Register, I know I'm over time, Your Honor, so I appreciate your indulgence, so I'll wrap up. The Federal Register notice that they cited didn't say that this was what it was, a joint approach to licensing to defeat SawStop and prevent its technology from getting adopted. It claimed that there was the same innocuous joint venture afoot. And there's just no case and there's no federal authority that suggests that Federal Register notice puts folks on notice of the fact that this is an antitrust violation. It may foreclose troubling, but it doesn't foreclose the doctrine of fraudulent concealment from doing its work. It doesn't foreclose these questions from going to juries. And the notion that we can't rely on denials alone, we agree with that, Your Honor, but these were very adamant, specific denials that represented that there was independence in the testing and evaluation of SawStop's technology, even though we ultimately learned from Mr. Piott and from discovery in this case that all this was being very carefully coordinated, all this data was being shared, so that the industry as a whole could come to the same conclusion. The last point. Thank you, sir. You want to wrap up with one last point? Thank you, Your Honor. Thank you very much.  It's worked hard, and the court's implementing it, worked hard to make sure that folks are not filing lawsuits half-cocked and without adequate basis. You need to establish your facts. You need to plead them concretely. We've heeded that instruction in this case. And if the court's rule is that you need to file a suit based on mere suspicion, Your Honor, we submit that's going to flood the court with premature lawsuits. There's a balance to be struck because you don't want people just sitting around indefinitely on their hands. And I know you say, well, we didn't do that, but that's – I think we've chewed the bone. The last one. There's a footnote in the court's opinion on this that notes discovery can be limited once we have specific facts. We had the facts from Mr. Piatt about the October 2001 meeting, and discovery can focus on that. Fraudulent concealment can get to the bottom quickly and efficiently. If you file a complaint before then, and that's what you have to do in order to be timely, that ability of courts to limit discovery will be upset. And not only will the courts be flooded, but there will be less ability to put tight limits. Thank you, Your Honor. We appreciate it. We thank you. We thank both of you.
judges: J. Harvie Wilkinson III, G. Steven Agee, James A. Wynn Jr.